# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>TEOFIL BRANK,<br>aka "Jarec Wentworth" | DOCKET NO. **15-0391M**<br><br>MAGISTRATE'S CASE NO.<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>MAR - 6 2015<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY |

Complaint for violation of Title 18, United States Code, Section 875(d)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE MICHAEL R. WILNER | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>March 4, 2015 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 875(d)]

Beginning on February 16, 2015 and continuing until March 4, 2015, in Los Angeles County, within the Central District of California, and elsewhere, defendant TEOFIL BRANK, with intent to extort from another person money and other things of value, knowingly transmitted in interstate commerce a communication, that is an electronic text message communication from a cellular telephone, a threat to injure the reputation of another person, in violation of 18 U.S.C. § 875(d).

LODGED
2015 MAR -6 PM 12: 1
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY _____

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**JAIME AGUIRRE, JR.**<br>OFFICIAL TITLE<br>Special Agent – Federal Bureau Of Investigation |
|---|---|

| Sworn to before me and subscribed in my presence, | | |
|---|---|---|
| SIGNATURE OF MAGISTRATE JUDGE[(1)]<br>MICHAEL R WILNER | | DATE<br>March 6, 2015 |

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSA Kimberly D. Jaimez x3779 REC: Detention KJ

## AFFIDAVIT

I, Jaime Aguirre, Jr., having been duly sworn, declare and state as follows:

### I. INTRODUCTION

1. I am currently a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, Los Angeles Field Office, and have been so employed since June 2014. I am an investigative and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.

2. As an FBI Special Agent, I received training at the FBI Academy located in Quantico, Virginia. Since November 2014, I have been assigned to the FBI's Los Angeles Division Violent Crime Squad. The Violent Crime Squad handles extortions, bank robberies, kidnappings, crimes against children, fugitives, and transportation crimes. In my assignment, I have participated in previous investigations concerning extortion victims. These investigations have included, among other things, participation in physical surveillance, execution of arrest/search warrants, handling of confidential informants and sources of information, arrests of violent crime offenders, as well as interviews of witnesses and defendants. I have also spoken on numerous

occasions with law enforcement officers and experienced investigators concerning the methods and practices of individuals involved in extortion schemes.

3.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the criminal complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.

## II. PURPOSE OF AFFIDAVIT

4.  This affidavit is made in support of:

    a.  a criminal complaint charging Teofil BRANK also known as Jarec Wentworth ("BRANK"), for a violation of Title 18, United States Code, Section 875(d): Interstate Communications Containing Threats to Injure the Property or Reputation of Another; and

    b.  a warrant to search the cellular telephone of BRANK described in paragraph 9 and Attachment A, which was discovered at the time of his arrest on March 4, 2015, for a violation of Title 18, United States Code, Section 875(d): Interstate Communications Containing Threats to Injure the Property or Reputation of Another.

5.  I make this affidavit based upon, among other things, personal knowledge derived from my participation in this

2

[Instrumentality Protocol]

investigation and upon information from multiple sources that I believe to be reliable, including the following:

    a.    My training and experience investigating violent crimes generally, and extortion schemes specifically;

    b.    Oral reports and documents about this investigation, which I have received and reviewed from other FBI agents and other law enforcement officials;

    c.    Interviews with the Victim conducted by other FBI agents and law enforcement officials, the results of which have been reported to me either directly or indirectly;

    d.    Public records and databases; and

    e.    Text messages.

6.    The facts set forth in this affidavit are based upon my personal observations and, where noted, information relayed to me by other law enforcement officials. I have set forth only those facts that I believe are necessary to establish probable cause to support the arrest and requested search warrant.

7.    Because this affidavit is being submitted for the limited purpose of obtaining the criminal complaint and search warrant discussed herein, I have not included each fact known to me concerning this investigation. Rather, I have provided the facts that I believe establish probable cause. Unless specifically indicated otherwise, all statements described herein are related in sum and substance only.

[Instrumentality Protocol]

## III. TARGET ARRESTED & PREMISES TO BE SEARCHED

8. I make this affidavit in support of a criminal complaint against Teofil BRANK.

9. The item to be searched is described in Attachment A and as follows: a black Samsung Galaxy Note 3, phone number 916-420-7906, identified by the serial number RV1DA4B75VZ, and International Mobile Equipment Identity (IMEI) number: 357518051898922/03 (the "SUBJECT TELEPHONE"). The SUBJECT TELEPHONE is currently in the possession of the FBI, in Los Angeles, and was discovered at the time of BRANK's arrest on March 4, 2015, for a violation of Title 18, United States Code, Section 875(d): Interstate Communications Containing Threats to Injure the Property or Reputation of Another.

## IV. ITEMS TO BE SEIZED

10. The items to be seized are described in Attachment B, which is incorporated herein by reference, and are evidence of violations of Title 18, United States Code, Section 875(d): Interstate Communications Containing Threats to Injure the Property or Reputation of Another.

## V. STATEMENT OF PROBABLE CAUSE

11. On March 3, 2015, the Victim made contact with the Los Angeles FBI office and FBI agents interviewed him regarding an extortion scheme in which he was victimized. According to the Victim, BRANK threatened to disclose embarrassing, sexual information about the Victim if the Victim refused to comply

4

[Instrumentality Protocol]

with BRANK's continuous demands. By the time the Victim met with FBI agents, including myself, the Victim had already conceded to several such demands.

### A. Victim's Initial Interview with FBI Agents

12. During the March 3, 2015 meeting at the FBI's Los Angeles Field Office, the Victim informed me and other FBI agents of the following:

    a. Between February 16, 2015, and February 28, 2015, the Victim received text message communications on his cellular phone from BRANK containing extortion demands. For each of these text messages, BRANK utilized phone number 916-420-7906. These extortion demands were received by the Victim while he was in multiple states including, but not limited to, Washington, Oregon, California, Mississippi, Florida, and New York. Upon information and belief, BRANK sent the text messages from phone 916-420-7906 to the Victim while BRANK was in California.

    b. BRANK threatened to publicize, through social media, details about the Victim's sexual liaisons. Specifically, BRANK initiated the extortion scheme by posting a comment on Twitter, a social media online website, in which BRANK alluded to embarrassing information about the Victim's sexual past.

    c. The Victim became aware of the social media message and responded by entertaining the demands of BRANK in order to prevent further damage to his reputation and to mitigate the perceived harm.

[Instrumentality Protocol]

d. On February 16, 2015, BRANK sent the Victim text messages demanding that the Victim wire funds to BRANK. To facilitate the transfer, BRANK sent the Victim routing number 121000248 and bank number 8110313197 via text message. BRANK further demanded that the Victim turnover his Audi R8 in order to prevent future social media postings or other defamatory information from being released.

e. In response to these messages, the Victim allowed BRANK to take possession of his Audi R8, valued at approximately $180,000 on February 16, 2015; and on February 17, 2015, the Victim wired BRANK $500,000 in order to meet BRANK's demands and prevent future social media postings or other defamatory information from being released.

B. **February 2015 Text Messages**

13. The text messages between BRANK and the Victim were extracted by the Victim's private investigative firm and provided to FBI agents during the March 3, 2015 meeting. The text messages corroborate the Victim's above account and demonstrate that BRANK was threatening to damage the Victim's reputation through the use of his Twitter account. BRANK informed the Victim that he was prepared to injure the reputation of the Victim if money and other things of value were not provided to BRANK. The text messages also confirm that the Victim agreed to concede to BRANK's demands.

[Instrumentality Protocol]

14. Specifically, BRANK sent the following messages to the Victim while the Victim was located in the states of Washington, Oregon, California, Mississippi, New York, and Florida:

    a.    2/16/2015: "I do have a twitter and your photos. Lies can be made or Maybe it's the truth"

    b.    2/16/2015: "Check my twitter, the conversation will grown [sic] and questions will be asked. You lied to me and treated me like Shit. I asked again and you put it behind you. Now it's biting your ass"

    c.    2/16/2015: "I can't get friendship anymore, because who will want to be friends with black mail. I only wanted to drive cars and Enjoy your company. I guess findin you boys is out of the picture So it leaves me with Nothing to want out of this. So I'm just going to bite hard. You got money but I Don't want that. Money won't wash away What people will read and see of you. Wow I guess I hold the cards right now"

    d.    2/16/2015: "I want a new car, motorcycle and both hands full of cash"

    e.    2/16/2015: "It's the car or another 250,000 cash. Taxes"

    f.    2/16/2015: "How do I know you won't report me for extortion"

    g.    2/19/2015: "I'll pick up the title in person. I Don't want to keep taking more and more. I'm

7

[Instrumentality Protocol]

    investing half into a business. I want to be happy and satisfied. Throw me another half mill. We will be done for sure. No more asking and taking. My word and promise"

 h. 2/19/2015: "No twitter no Nothing. All gone and safe for you. This will make me disappear"

 i. 2/24/2015: "[Victim] I'm in love with the car"

 j. 2/24/2015: "I'll get the title tomorrow"

 k. 2/26/2015: "What is going on with everything? I'm tired of Waiting and Not getting anything done with you"

15. According to the Victim, over the days following the above text message exchange, the Victim continued communicating with BRANK regarding additional demands and the title to the Audi. However, instead of making additional payments or concessions to BRANK, the Victim decided to contact the FBI through his counsel. This decision led to the March 3, 2015 meeting.

 C. **March 2015 Text Messages**

16. During the March 3, 2015 meeting with FBI agents, the Victim received additional text messages from BRANK demanding a condominium and an additional monetary sum of $300,000. BRANK then changed his demand to $1,000,000 cash. With the Victim's consent, FBI Agents witnessed the exchange of these text messages between the Victim and 916-420-7906.

[Instrumentality Protocol]

17. Specifically text messages to the Victim from BRANK on March 3, 2015, contained the following messages while the Victim was in California:

    a. 3/3/2015: "New deal"

    b. 3/3/2015: "Account will be deleted if new deal is reached."

    c. 3/3/2015: "I want a condo here in LA. Bachelor pad. You have a taste I like. 2 bed Max. Perfer [sic] one. I want 300,000.00 cash. You can and will. I want this over ASAP like yesterday. So you can be at peace."

    d. 3/3/2015: "They go for more though"

    e. 3/3/2015: "1 mill cash"

18. On March 3, 2015, the Victim, in conjunction with FBI agents including myself, sent BRANK text messages in which the Victim agreed to meet with BRANK to ostensibly turn over the $1,000,000 in cash and the title for the Audi. Via text message, BRANK and the Victim agreed to meet the following day, on March 4, 2015.

19. The following day, March 4, 2015, BRANK instructed the VICTIM via text message, to meet at the Grove, a shopping center located at 189 The Grove Drive Los Angeles, Ca 90036. The Victim immediately shared this text with FBI agents including myself.

20. In response to BRANK's message, at the FBI's direction, the Victim sent BRANK a text message requesting a different meeting location: a Starbucks in El Segunda, CA. In

conjunction with the FBI agents, the Victim also told BRANK, via text message, that a "trusted friend" would make the delivery on his behalf. Because the Victim feared BRANK and feared for his safety, I and fellow FBI agents decided to send an undercover agent, who would make the delivery on behalf of the Victim before the arrest.

### D. Recorded Phone Call

21. On March 4, 2015, at approximately 7:51 p.m., BRANK called the Victim, while the Victim was with me at the FBI's office, to discuss the change of location.

22. During a recorded conversation, BRANK indicated concerns about the change in venue and concern about the Victim sending a "friend." Specifically, BRANK stated: "I don't wanna walk up there and f*ckin' all of a sudden it's the Fed or something or some bullsh*t, something happens and I'm f*cked."

23. In response, the Victim indicated to BRANK that the VICTIM would be comfortable with BRANK bringing a friend to the meeting, and then informed BRANK of the exact address of the Starbucks location. The conversation then ended.

24. After the phone call, Victim sent BRANK a text message with the address of Starbucks located at 530 N. Sepulveda Blvd., El Segundo, CA 90245.

### E. Meeting & Recovery of the Audi

25. At approximately, 8:30 p.m. on March 4, 2015, an undercover FBI agent met with BRANK at the Starbucks located 530 N. Sepulveda Blvd in Los Angeles. The conversation between

BRANK and the undercover agent was recorded; the events of the evening were observed by other FBI agents, including FBI Special Agents Michael Winning and Jonathan Bauman. The undercover agent relayed the following information to me regarding the March 4, 2015 meeting and subsequent developments:

a. During a recorded conversation (that commenced at approximately 8:30 p.m. on March 4, 2015) the undercover FBI agent, acting as the Victim's friend, handed BRANK the title to the Audi and explained to BRANK the process of transferring title of the Audi into BRANK's name. The undercover agent ripped off the top part of the title and gave the bottom half to BRANK. Subsequently, the undercover agent and BRANK began discussing the remaining part of the transaction (i.e., $1,000,000).

b. The undercover agent then left the Starbucks, followed by BRANK, to recover the funds from his car. The undercover agent led BRANK to the trunk of his car and indicated to BRANK that the money was in a bag in the trunk of the car. While BRANK and the agent were discussing the bag, agents arrived and arrested BRANK.

c. After BRANK was placed into handcuffs, FBI agents made contact with an individual (later identified as Etienne Yim) sitting in a 2014 Ford hatchback car in the Starbucks parking lot and questioned him about his purpose there. During questioning, FBI agents discovered that Yim was present to accompany BRANK during the transaction. Yim admitted to being an associate of BRANK and admitted to knowing about the

extortion scheme. Yim met with agents, later that evening, and confirmed that the text messages were sent from BRANK's SUBJECT TELEPHONE to the Victim.

d. Yim also informed FBI agents that BRANK (i) asked Yim to drive to the Starbucks that evening and (ii) asked Yim to bring a gun for BRANK's protection. Agents searched the car in which BRANK and Yim arrived at the Starbucks and discovered (i) a Colt Magnum 357 revolver along with six rounds of Winchester .38 special ammunition and (ii) a Samsung smartphone, the SUBJECT TELEPHONE, corresponding to the 916-420-7906 phone number, that is, the number that had been sending demands to the Victim via text message. Yim confirmed that the SUBJECT TELEPHONE belonged to BRANK and BRANK asked him to send the Victim a message confirming that they had arrived at the Starbucks.

e. Yim, who has no criminal history, claims that he did not actively assist in the extortion scheme, beyond driving BRANK to the Starbucks and obtaining a weapon for BRANK's use. Yim further informed FBI agents that BRANK had deposited $400,000 of the funds into a Wells Fargo savings account and obtained a Wells Fargo Euro currency credit card (to facilitate travel to and in Europe). Finally, Yim informed agents where BRANK had been staying and storing the Audi.

f. On March 5, 2015, FBI agents recovered the Audi from the location disclosed by Yim.

[Instrumentality Protocol]

## VI. PROBABLE CAUSE FOR ITEMS TO BE SEIZED

26. Based on the evidence described above, I believe that it is highly probable that fruits, instrumentalities, and evidence of violations of Title 18, United States Code, Section 875 will be found on BRANK's Samsung cell phone, that is, the SUBJECT TELEPHONE. Based upon my training and experience, I have reason to believe the items and records (i.e., text messages and call history) described above and in Attachment B to this affidavit will be found on the SUBJECT TELEPHONE.

27. Based on my training, experience and general knowledge of the prevalent use of digital devices, I believe that most of the aforementioned items are stored electronically. Indeed, nearly all of the extortion demands were made by communications between BRANK and the Victim during February 2015 and March 2015 and occurred almost exclusively via mobile telephone, by voice as well as through text message. Thus, it is likely that the SUBJECT TELEPHONE will provide evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 875(d): Interstate Communications Containing Threats to Injure the Property or Reputation of Another.

28. Based upon my training, experience, knowledge of this investigation, and conversations with other experienced investigators regarding extortion schemes, I know that extortion demands are commonly made via mobile devices.

29. I know that those involved in extortion frequently use cellular telephones in furtherance of their crimes to communicate, and frequently store names, addresses and telephone

13

numbers of others involved in the trade as well as those of their victims.

30. Additionally, I know that those involved in such criminal schemes frequently store notes and other pertinent information about their illegal schemes, within their cellular devices.

31. I am also aware of cases where those involved in extortion schemes, such as here, send text messages to each other related to the criminal activity. I believe these text messages could, among other things, assist law enforcement agents in their efforts to identify other co-conspirators.

32.

### VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

33. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my

knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

    a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

    b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

    c. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.

[Instrumentality Protocol]

Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

    d. Although some of the records called for by this warrant might be found in the form of user-generated documents

[Instrumentality Protocol]

(such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a

17

[Instrumentality Protocol]

controlled laboratory environment, and also can require substantial time.

    e.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

    f.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII. <u>CONCLUSION</u>

34. Based on my training, experience and the facts set forth above, I believe that there is probable cause to believe that BRANK has violated: Title 18, United States Code, Section 875(d): Interstate Communications Containing Threats to Injure the Property or Reputation of Another.

35.  For all the reasons described above, there is probable cause to believe that evidence of violations of Title 18, United States Code, Section 875(d): Interstate Communications Containing Threats to Injure the Property or Reputation of Another, as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PHONE, as further described above and in Attachment A of this affidavit.

_____
JAIME AGUIRRE, JR.
Special Agent
FBI

Subscribed to and sworn before me this 6th day of March, 2015.

_____
HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE